UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

FILED
NOV 29 2005

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| COUNCIL OF INSURANCE AGENTS + BROKERS, and JAMES T. JOYCE, | * * * * | CIV 04-3003<br>**2005 D.S.D. 21** |
| Plaintiffs, | * * | |
| | * * * | FINDINGS OF FACT, CONCLUSIONS OF LAW, and OPINION-ORDER |
| -vs- | * * | |
| GARY R. VIKEN, in his official capacity as South Dakota Secretary of Revenue and Regulation, and GARY STEUCK, in his official capacity as Director of South Dakota Division of Insurance, | * * * * * * | |
| Defendants. | * * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**KORNMANN, U.S. DISTRICT JUDGE**

[¶1]   Plaintiff ("Council") brought this suit against defendants alleging that certain requirements imposed by the State of South Dakota and enforced by the South Dakota Secretary of Revenue and Regulation and the Director of the South Dakota Division of Insurance are unconstitutional under the U.S. Constitution's Privileges and Immunities Clause.[1] U.S. Const., art. IV, § 2. The parties submitted cross motions for summary judgment (Docs. 28 and 30). The Court denied those motions (Doc. 53). The Council then moved to add another plaintiff (Doc. 60) and moved to amend the complaint (Doc. 62). The parties entered into a stipulation

---

[1] In Count I of plaintiffs' amended complaint, plaintiffs claim that the defendants' enforcement of SDCL 58-6-62 to 58-6-64 violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Plaintiffs, through their attorneys, conceded on the record at trial that they have abandoned this claim. Their evidence and argument at trial was limited to the claimed violation of the Privileges and Immunities Clause.

allowing for the amendment to the complaint and the addition of a plaintiff (Doc. 64). The Court granted the plaintiff's motions (Doc. 65). James Joyce ("Joyce") was added as a plaintiff and an amended complaint (Doc. 67) was filed. A trial to the Court was held on September 29, 2005.

## FINDINGS OF FACT

[¶2]   1. The Council is a trade association founded in 1913. Its membership consists of more than 300 commercial insurance agencies and brokerages. The member agencies and brokerages sell insurance in multiple states and territories, including the State of South Dakota. The Council has no natural person members. All members are corporations or partnerships.

[¶3]   2. Among those claimed to be "represented" by the Council are individuals who are licensed as insurance agents and brokers in South Dakota but who do not reside in South Dakota. Joyce is the vice president of commercial operations for JMB ("JMB"), an insurance agency. Joyce is licensed in South Dakota as a nonresident agent. JMB is a member of the Council.

[¶4]   3. The South Dakota Secretary of Revenue and Regulation is statutorily charged with enforcing the insurance laws of the State of South Dakota. SDCL 1-47-9. The South Dakota Division of Insurance is statutorily charged with administering the insurance laws of the State of South Dakota. SDCL 58-2-1.1.

[¶5]   4. There are approximately 9,000 licensed resident insurance producers in South Dakota. There are approximately 24,000 licensed nonresident insurance producers.

[¶6]   5. South Dakota requires that every agent or broker who sells or solicits the purchase of insurance in South Dakota be licensed by the South Dakota Division of Insurance. SDCL 58-30-143.

[¶7]   6. Nonresident agents' requirements, in order to be licensed and participate in the South Dakota insurance industry, are slightly different than resident agents' requirements. Residents of South Dakota are required to complete an application, send in the requisite fee, and take an examination before becoming a licensed insurance agent. The examination is only initially and there is no test or examination to ensure that, after the first year, resident agents are cognizant of changes in the law. Nonresident insurance agents must also complete an application and send in the requisite fee but are not required to take a written examination. Nonresident agents are

exempt from South Dakota continuing education requirements, so long as they continue to satisfactorily participate in continuing education in their state of residence.

[¶8] 7. Additional requirements are imposed on nonresident agents and brokers. The requirements that nonresident agents selling policies for use in South Dakota obtain a countersignature from a licensed resident agent and pay a countersignature fee to the South Dakota resident are challenged in this lawsuit. *See* SDCL 58-6-62 to 58-6-64.

[¶9] 8. Larson Manufacturing Company ("Larson") is a South Dakota corporation for whom Joyce, through JMB, annually places insurance policies covering risks located in South Dakota and elsewhere. Larson's business with JMB represents a small percentage of JMB's overall insurance business.

[¶10] 9. Joyce's compensation from JMB is comprised of a salary and an annual bonus. His latest bonus check, which was at the discretion of the corporation's president and drawn from an employee bonus pool, was approximately $15,000. This amount represented about 10% of his annual salary.

[¶11] 10. Complying with South Dakota's countersignature laws results in a lower bonus pool at JMB because of the amount that is paid out to countersigning agents. JMB earns about $150,000 in gross commissions from the insurance companies insuring Larson. Of this $150,000, approximately $20,000 goes to countersigning agents who are South Dakota residents. Everything being equal, with the countersignature laws in place, it costs JMB more to do business in South Dakota than it does in other states. A lower bonus pool adversely affects JMB producers, including Joyce.

[¶12] 11. As part of Joyce's duties to Larson, he reviews its current coverages, selects appropriate insurance carriers for its various needs, and checks to be sure that policies comply with the laws of the state where the coverage is required. A corporation of Larson's size has myriad insurance needs, including, *inter alia*, property insurance, general liability insurance, director and officer liability insurance, worker's compensation insurance, automobile insurance, and umbrella coverage. In total, Larson presently requires eleven policies, which are provided by five different carriers.

[¶13]   12. The countersignature requirement creates a separate and distinct process which Joyce must monitor. This includes multiple follow up calls to all five individual insurance carriers to ensure that the appropriate endorsements are issued by the local South Dakota countersigning agents. In Larson's case, where different policies and different carriers are involved, there are different rules that have to be followed vis-a-vis the countersignatures. Multiple signatures are required as to each policy. Joyce testified that it could take three or four months to complete all of the applicable steps. The countersignature requirement also causes delays in getting the policies to the insured, sometimes twice as much time being involved; this is detrimental to the insured to not readily have the policies on hand to check them and be knowledgeable about them.

[¶14]   13. Once the endorsements are in place, it is necessary to check to see that fees have been properly computed and paid. If the countersignature fee is paid by the carrier, the commissions from the carrier to JMB are reduced. If the countersignature fee is not paid by the carrier, it comes directly from JMB.

[¶15]   14. Once a policy is delivered to a client such as Larson, changes may occur throughout the year. Examples include additional insurance coverage needed when the corporation acquires more vehicles, locations, or property, or simply desires more or different coverage for whatever reason. The countersignature requirement affects this additional coverage as well. Any new premium amounts as to these areas would affect the calculation of the proper countersignature fees.

[¶16]   15. One of the challenges inherent in the insurance industry is keeping abreast of individual state laws with respect to tort law, worker's compensation, unfair practices, cancellation of policies, mandated benefits, and other items. Such laws vary from jurisdiction to jurisdiction.

[¶17]   16. Nonresident agents must certify that they are familiar with the requirements of South Dakota law in applying for a license. As Joyce testified at trial, there are numerous ways in which nonresident agents can and do stay apprised of changes in the law, in South Dakota and elsewhere. Many insurance companies, including JMB, have checklists in place that are reviewed each time an insurance policy is placed. Nonresident agents are capable of obtaining information on changes in the law by reviewing web sites, speaking with resident agents with

whom they are familiar (without forfeiting a set portion of commission proceeds), speaking with the companies they are representing, obtaining legal advice, relying on trade associations such as the Council, and even speaking directly with the Division of Insurance. The evidence presented did not demonstrate that nonresident licensed insurance agents are less competent or have inferior access to information regarding South Dakota law.

[¶18]   17. Gary Joyce, an agent with Howalt McDowell Insurance, Inc. ("Howalt McDowell"), in Sioux Falls, South Dakota, testified that, as a countersigning agent, he reviews policies and informs nonresident agents of items that are inappropriate or illegal, responds to questions regarding bonds, and generally gives South Dakota individuals and businesses dealing through a nonresident licensed agent "another set of eyes" to see that everything is done correctly.

[¶19]   18. Howalt McDowell receives about $10 million in commissions annually. This includes approximately $50,000 to $60,000 for countersigning policies.

[¶20]   19. South Dakota Governor M. Michael Rounds ("Rounds"), who is an insurance producer and owner of Fischer, Rounds & Associates, Inc. ("Fischer Rounds"), testified that he countersigned policies as a resident agent. Rounds believes that the countersignature provides a safeguard to South Dakotans and an opportunity for South Dakotans to have personal contact with a local insurance agent. Rounds cited examples from his practice where, as a countersigning agent, he received incorrect forms on performance or payment bonds and saw to it that such forms were corrected. If such an incorrect form went on to the party requesting the bond, it would be held up or rejected and delays would likely result. He also discussed an example where an errors and omissions policy for a South Dakota real estate agent was wrong, according to South Dakota law. As a countersigning agent, he was able to catch the error in the form and correct it so that it complied with South Dakota law.

[¶21]   20. Rounds estimated that, in 2002, Fischer Rounds earned commissions between $3.5 and $4 million dollars. About $3,000 to $5,000 of that amount was received for countersigning.

[¶22]   21. There is no requirement that a South Dakota insured being served by a nonresident insurance agent have a geographically proximate countersigning agent. In other words, a resident agent in Buffalo, South Dakota, can countersign a policy for an insured living in Elk Point, South Dakota. Technological advances have molded today's marketplace such that business is

increasingly conducted by telephone, facsimile, electronic mail, and the internet. These advances have made communication more effective in all industries, including the insurance industry. Realistically, no reasonable consumer makes a trip to his insurance agent's office each time there is a question or concern about an insurance policy, even if the agent is just across town. Rather, most questions or concerns that South Dakota businesses or individuals have about their insurance policies would be handled over the telephone or by some similarly convenient means. There is no persuasive evidence that nonresident licensed agents are less available.

[¶23]  22. The Division of Insurance does not have any specific involvement in enforcing the counter signature law. There are no specific statutory or regulatory duties imposed on countersigning agents. Randy Moses, assistant director of the Division of Insurance, testified that he has no direct knowledge of what countersigning agents do or do not do when they receive a policy. Countersigning agents may permissibly do no more than provide a signature on the policy. There is no requirement that they look at the policy or vouch for anything. There are no enforcement mechanisms to ensure that the countersigning agents perform any function other than a signature. There was no competent evidence to show that the mandated statutory fee has any reasonable relationship to the value of the countersignature, the time spent, or the skill required.

[¶24]  23. All states, other than South Dakota and Nevada, no longer have any similar requirements as are contained in South Dakota's countersignature laws.

## CONCLUSIONS OF LAW

### A. Standing

[¶25]  1. "Federal courts are not courts of general jurisdiction and have only the power that is authorized by Article III of the Constitution and statutes enacted by Congress pursuant thereto." Marine Equipment Management Co. v. U.S., 4 F.3d 643, 646 (8th Cir. 1993) (citing Bender v. Williams-Port Area School Dist., 475 U.S. 534, 541, 106 S. Ct. 1326, 1331, 89 L. Ed. 2d 501 (1986) (citing in turn Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L. Ed. 60) (1803))). "The threshold inquiry in every federal case is whether the court has jurisdiction" and the Eighth Circuit has "admonished district judges to be attentive to a satisfaction of jurisdictional

requirements in all cases." Rock Island Millwork Co. v. Hedges-Gough Lumber Co., 337 F.2d 24, 26-27; Sanders v. Clemco Industries 823 F.2d 214, 216 (8th Cir. 1987).

[¶26]  2. Standing is a threshold matter that, if absent, prevents this court from exercising jurisdiction. Arkansas Right to Life State Political Action Comm. v. Butler, 146 F.3d 558, 560. (8th Cir. 1998). *See* Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) (holding that federal courts may not consider other issues before resolving standing, an Article III jurisdictional matter). The Constitution requires a party to satisfy three elements before such party has standing to bring suit in federal court and those three elements are injury in fact, causation, and redressability. Steel Co., 523 U.S. at 103. The party invoking federal jurisdiction has the burden of establishing these three elements. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

[¶27]  3. "The question of standing 'involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" Bennett v. Spear, 520 U.S. 154, 162 (1997) (*quoting* Warth v.Seldin, 422 U.S. 490, 498 (1975)). As an aspect of justiciability, the standing question is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf. Baker v. Carr, 369 U.S. 186, 204 (1962).

[¶28]  4. The Privileges and Immunities Clause of Article IV of the United States Constitution does not protect corporations and other business entities. W. & S. Life Ins. Co. v. Bd. of Equalization, 451 U.S. 648, 656 (1981). *See also* Paul v. Virginia, 75 U.S. (8 Wall.) 168, 177, 181 (1868) (a corporation is not a "citizen" within the meaning of the Privileges and Immunities clause).

[¶29]  5. The showing that is required to satisfy constitutional standing requirements is minimal. United States v. SCRAP, 412 U.S. 669, 689 n. 14 (1973) ("'Injury in fact' reflects the statutory requirement that a person be 'adversely affected' or 'aggrieved,' and it serves to distinguish a person with a direct stake in the outcome of a litigation--even though small--from a person with a mere interest in the problem."). The Supreme Court has allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, *see* Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663; a $5 fine and

costs, *see* McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393; and a $1.50 poll tax, Harper v. Virginia Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169.

[¶30] 6. "The law recognizes non-economic injuries for standing purposes." Minnesota Federation of Teachers v. Randall, 891 F.2d 1354, 1358 n. 6 (8th Cir. 1989). Also, indirect economic injury can constitute an injury-in-fact. *See* Ben Oehrleins and Sons and Daughter, Inc. v. Hennepin County, 115 F.3d 1372 (8th Cir. 1997).

[¶31] 7. The claimed "injury-in-fact" of Joyce is sufficient to meet the minimal requirement as to standing. It is clear from the evidence presented that, while very tangential, there is an indirect economic harm created by the countersignature fees. The bonus pool, from which Joyce's annual bonus is drawn, is lower because of the countersignature requirements. Moreover, although defendants claim that the administrative burdens of the countersignature are minimal, there is no question that the countersignature requirements create some additional administrative and clerical tasks for nonresident agents such as Joyce.

[¶32] 8. It could well be that the Council also has standing. In view of the Court's ruling as to Joyce, there is no need to address that as I did in the earlier order (Doc. 53).

**B. Privileges and Immunities**

[¶33] 1. Article IV, Section 2, of the United States Constitution provides that "Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

[¶34] 2. "[T]he Privileges and Immunities Clause was intended to create a national economic union." Supreme Court of New Hampshire v. Piper, 470 U.S. 274, 279-80 (1985). The Supreme Court has repeatedly found that "one of the privileges which the Clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State." *Id.* at 280 (*quoting* Toomer v. Witsell, 334 U.S. 385, 396 (1948)).

[¶35] 3. One of the fundamental rights protected under the Privileges and Immunities Clause is "the right of a citizen of one state to pass through, or to reside in any other state, for purposes of . . . professional pursuits." Baldwin v. Fish and Game Comm'n, 436 U.S. 371, 384 (1978). "[T]he ability of a citizen of one state to act as an insurance consultant in another state must be considered a fundamental right or privilege protected by the privileges and immunities clause." Silver v. Garcia, 760 F.2d 33, 36 (1st Cir. 1985).

[¶36]   4. Likewise, nonresident insurance agents and producers licensed in South Dakota have a fundamental right or privilege to place insurance in the State of South Dakota which right is protected by the Privileges and Immunities Clause. In other words, they have a right to place insurance in South Dakota on terms of substantial equality with South Dakota licensed resident agents.

[¶37]   5. Being called upon to decide whether certain South Dakota laws violate the United States Constitution is a heavy burden and one the court does not relish or take lightly. Certain general principles of law must be applied in the necessary analysis. There is a strong presumption of constitutionality as to these provisions. Unless unconstitutional on its face, there must be a clear showing of arbitrariness and irrationality or clear conflict with the United States Constitution. Plaintiffs bear a heavy burden. "To succeed in a constitutional challenge to a legislative act, the challenger must prove beyond a reasonable doubt that the legislature acted outside of its constitutional authority." Wegleitner v. Sattler, 1998 SD 88, ¶ 4, 582 N.W.2d 688, 689 (1988) (quoting City of Chamberlain v. R.E. Lien, Inc., 521 N.W.2d 130, 131 (S.D. 1994)). In order to address the constitutionality of the statutes the Court must first determine the proper construction of the statute. "The construction of a statute is a question of law." Delano v. Petteys, 94 SD 700, 520 N.W.2d 606, 608 (1994) (quoting Petition of Famous Brands, Inc., 347 N.W.2d 882, 884 (S.D.1984)). "While, legislative acts are presumed to be constitutional, that presumption disappears when the unconstitutionality of the act is, 'clearly and unmistakenly shown and there is no reasonable doubt that it violates constitutional principles.'" S.D.E.A. v. Barnett, 1998 SD 84, ¶ 22, 582 N.W.2d 386, 392 (quoting Poppen v. Walker, 520 N.W.2d 238, 241 (S.D. 1994)).

[¶38]   6. SDCL 58-6-62 provides that "[n]o authorized insurer may make, write, issue, or place any policy . . . [or] contract of insurance . . . unless the policy is written through a licensed resident insurance producer, or a licensed nonresident insurance producer . . . [and] countersigned by a resident insurance producer." SDCL 58-6-63 provides that "[t]he licensed resident insurance producer, if countersigning for a licensed nonresident insurance producer, shall receive for this service five percent of the total premium or twenty-five percent of the commission whichever is less."

[¶39]   7. There is no competent evidence showing that the value of a countersignature is five percent of the total premium or 25% of the total commission or any other set amount.

[¶40]   8. A law burdens a fundamental right when it treats two groups of similarly situated persons differently solely on the basis of residence. Supreme Court of Virginia v. Friedman, 487 U.S. 59, 66-67 (1988). SDCL 58-6-62 through SDCL 58-6-64 deprive licensed nonresident agents of a protected privilege, namely, the right to do business in the State of South Dakota without additional administrative burdens and expense.

[¶41]   9. "Like many other constitutional provisions, the privileges and immunities clause is not an absolute." Toomer, 334 U.S. at 396. "The Clause does not preclude discrimination against nonresidents where (i) there is a substantial reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State's objective." Piper, 470 U.S. at 284. In deciding whether the discrimination bears a close or substantial relationship to the State's objective, the Court also considers the availability of less restrictive means. Id.

[¶42]   10. In Osborn v. Ozlin, 310 U.S. 53, 60 (1940), the plaintiffs challenged a countersignature law under the unspecified "rights protected by the Fourteenth Amendment of the Constitution." The Supreme Court held that the countersignature was constitutional in Osborn but the Court was not asked to consider the countersignature's validity under the Privileges and Immunities Clause. The analysis under the Fourteenth Amendment is different than what is applied in this case. Specifically, the defendants in Osborn only had to show that there was a legitimate state interest and that the countersignature law was rationally related to that interest. There is a heightened standard of review, described above, where the Privileges and Immunities Clause is involved. The Court will consider this case, bearing in mind the standard of review the Supreme Court has crafted in Piper and its progeny.

[¶43]   11. In defendants' view, the countersignature laws protect the citizens of South Dakota by advancing two goals, briefly stated: (1) agent competence, and (2) agent accessibility and accountability.

[¶44]   12. Possible personal contact with a resident insurance agent does not provide a substantial reason for the difference in treatment. The notion that a nonresident agent is less

capable of providing assistance on a policy outside of that agent's state of residence does not constitute a sufficient reason for the difference in treatment and the discrimination practiced

[¶45]   13.   The countersignature laws and the discrimination practiced do not bear a substantial relationship to any legitimate objectives of South Dakota.

[¶46]   14.   There are less restrictive means available to advance the State's goals. The Division of Insurance could alter licensing requirements or even require that nonresidents pass the same examination that residents take, one which covers South Dakota law. Even if licensing requirements were heightened to the point of requiring nonresident agents to pass an examination, it would be much less burdensome than the countersignature, which imposes both economic and administrative burdens on each and every insurance transaction where nonresident agents are involved.

[¶47]   15.   There is no substantial valid reason for the difference in treatment between and among (a) resident licensed insurance agents and (b) nonresident licensed insurance agents.

[¶48]   16.   Assuming that there is some wisdom to a resident licensed agent checking the policies, there is nothing to prevent an insured or a nonresident agent from having this done voluntarily.

[¶49]   17.   Striking down the countersignature requirements may well cause prudent insureds to deal initially only with resident licensed agents, a benefit to residents which South Dakota claims to seek to protect.

[¶50]   Now, therefore,

[¶51]   IT IS ORDERED:

(1)   The plaintiffs' request in their amended complaint (Doc. 67) for declaratory and injunctive relief is granted.

(2)   Based upon the foregoing findings of fact and conclusions of law, it is hereby declared that SDCL 58-6-62, 58-6-63, and 58-6-64 violate the Privileges and Immunities Clause of the United States Constitution to the extent that they deny South Dakota licensed nonresident agents the same rights and privileges they afford to South Dakota licensed resident agents.

(3)   The defendants are hereby enjoined and restrained from any further enforcement of SDCL 58-6-62, 58-6-63, and 58-6-64, to the extent that they deny South Dakota licensed

nonresident agents the same rights and privileges they afford to South Dakota licensed resident agents.

[¶52] Dated this 29th day of November, 2005.

BY THE COURT:

*Charles B Kornmann*
CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: *Barbara J Paephe*
DEPUTY
(SEAL)

12